### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

```
-----------------------------------------------------X
JOHN DOE,                                   :
                                            :        Civil Action No: 1:17-cv-3781
                           Plaintiff,       :
                                            :        COMPLAINT AND
              -against-                     :        DEMAND FOR JURY TRIAL
                                            :
UNIVERSITY OF CHICAGO,                      :
                                            :
                           Defendant.       :
-----------------------------------------------------X
```

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Falkenberg Fieweger & Ives LLP and Warshaw Burstein, LLP, as and for his complaint, respectfully alleges as follows:

### NATURE OF THE ACTION

1.     Plaintiff was wrongfully expelled from the University of Chicago (the "University").  His reputation has been tarnished and a once promising career has been put in jeopardy.  Worse yet, if not remedied, the school's actions will result in Plaintiff's deportation.

2.     Although, the University's disciplinary committee found substantial mitigating circumstances, Plaintiff was found responsible for violating the University's Policy on Discrimination, Harassment, and Sexual Misconduct. However, to be clear, he never committed, or was accused of, any sexual assault, sexual touching, or committing any physical harm.

3.     Under the circumstances, the University's disciplinary committee placed Plaintiff on disciplinary probation and restricted access to certain school locations where his accuser was

---

[1]     Plaintiff has filed, contemporaneously with this complaint, a motion to proceed pseudonymously.

likely to frequent. In January 2010, the disciplinary committee also issued a No-Contact Directive requiring him to refrain from making contact with the accuser.

4. Unfortunately for Plaintiff, at that time, the University's campus permeated with an anti-male bias with respect to alleged sexual assaults committed against female students who believed the University failed to respond promptly and equitably to their complaints of sexual misconduct. Indeed, three federal investigations were pending regarding the University's alleged failure to properly respond to reports of sexual assault by female students. Incidents of alleged rapes and sexual harassment at the University became national news and were widely reported.

5. Upon information and belief, at that time, the University felt compelled to respond more aggressively and vigilantly to complaints against male students accused of sexual misconduct.

6. Despite the determination of the disciplinary committee, a Review Board then expelled Plaintiff for his actions. Such an action was entirely unprecedented and violated the University's own policies and rules.

7. Indeed, publicly available records do not show a single instance where the Review Board increased a punishment, much less independently expelled a student.

8. Those publicly available records also do not show a single instance where a student accused of conduct similar to that of which Plaintiff was accused was expelled.

9. Moreover, the Review Board, acting entirely outside its authority under the University's rules and policies, increased Plaintiff's punishment because of a supposed "threat of continuing harassment" by Plaintiff against his accuser. In actuality, there was absolutely no evidence of any threat of continuing harassment and such a determination was contrary to the

findings of the University's Committee, as well as the safeguards put in place by the Committee to limit future contact between Plaintiff and his accuser.

10. The unprecedented decision of the Review Board (the anonymous members of which are never disclosed) was entirely arbitrary, capricious and made in bad faith in violation of the contractual and statutory rights of Plaintiff.

11. Upon information and belief, it was also issued as a result of the anti-male atmosphere then permeating the campus.

12. Further, because Plaintiff is a citizen of a foreign country, as a result of the expulsion, his student visa has been terminated and he is subject to immediate deportation in the absence of the Court's intervention.

## JURISDICTION AND VENUE

13. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state and a citizen or subject of a foreign state.

14. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this matter arises under the laws of the United States, namely Title IX of the Education Amendments of 1972.

15. This Court also has supplemental jurisdiction over the alleged state law claims because they are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because this is a judicial district in which the defendant resides, and in which a substantial part of the events or omissions giving rise to the claims occurred.

## THE PARTIES

17.     Plaintiff is a citizen or subject of a foreign state within the meaning of 28 U.S.C. § 1332(a)(2) and is not lawfully admitted for permanent residence in the United States.

18.     Upon information and belief, the University is a not-for-profit organization with its principal place of business in Chicago, Illinois.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

19.     Plaintiff was a Ph.D. student at the University of Chicago and he worked extremely hard to achieve one of the highest rankings in his program.

20.     He is a citizen of a foreign country[2] that has different cultural values and cultural norms than the United States.  Specifically, in the conservative culture in which Plaintiff was raised, romantic courtships are commonly non-sexual and merely consist of a male and female spending time together.  Acts by a female such as inviting a male to spend time together privately or to engage in various everyday activities are considered signs of romantic interest.

21.     Jane Roe[3] was also a Ph.D. student at the University of Chicago.  She is also from the same country as Plaintiff.

22.     Plaintiff became romantically interested in Jane Roe.

23.     Jane Roe's actions, seen through the lens of their shared culture, indicated she was also romantically interested in Plaintiff.  The two regularly spent time together.  She also invited him to join her in activities such as swimming and jogging. She also verbally expressed to Plaintiff that she might be interested in romantic relationship with him.

---

[2]     The name of the country is not disclosed in order to protect the anonymity and privacy interests of Plaintiff and certain non-parties.

[3]     Her real name is not provided in order to protect her anonymity and privacy interests.

24.     Based on these interactions, as well as the fact that the two spent large amounts of time with one another, Plaintiff believed he was in a romantic relationship with Jane Roe, despite the fact that the two never kissed, much less engaged in sexual activity of any kind.  For this reason, Plaintiff regularly contacted Jane Roe and expressed his feelings for her.

25.     Although Plaintiff's unorthodox views on courting may seem out of place in the modern United States and some might find them unbelievable, these were Plaintiff's true-felt views on the nature of male-female relationships.

26.     Indeed, it is undisputed that, on more than one occasion, Plaintiff became upset when someone questioned or joked about Jane Roe's virginity.  Plaintiff was raised with the expectation that a couple would remain virgins until marriage.

27.     Jane Roe viewed their relationship differently.  At some point, she ceased to have any romantic interest in Plaintiff.  However, to Plaintiff, her actions continued to suggest that she did have a romantic interest.

28.     This misunderstanding resulting from Plaintiff's cultural upbringing, as well as from "mixed signals" given by Jane Roe, led to tension between the two.

29.     Based on her perception of their interactions, in January 2017, Jane Roe filed a complaint with the University against Plaintiff.  The school immediately issued a "no-contact directive" limiting Plaintiff's contact with Jane Roe.

30.     The school initiated an investigation as part of a disciplinary proceeding against Plaintiff.

31.     This could not have come at a worse time for Plaintiff.

32.     At that time, the University was in the grips of a public relations crisis regarding the school's failure to specifically protect female students from sexual assaults committed by

males. There was a strong sentiment on campus and in the media for the school to aggressively go after males accused of sexual misconduct.

33. On March 1, 2016, the Chicago Tribune published an article entitled, "Federal authorities investigating sexual violence complaints at several area colleges." That article discussed three federal investigations relating to the University's failure to adequately respond to female students who reported being sexual assaulted by males. In response to then newly-implemented procedures at the school relating to complaints of sexual assault, one female rape victim is quoted as saying that, "she doesn't believe the school has done enough."

34. On February 2, 2016, an article in the New York Times entitled, "Chicago Professor Resigns Amid Sexual Misconduct Investigation," specifically discusses problems faced by female science graduate students at the University, noting that the "resignation comes amid calls for universities to be more transparent about sexual harassment in their science departments, where women account for only one-quarter of senior faculty jobs." The article further noted that "some students and faculty members also raised pointed questions about whether the university had placed female graduate students at risk by hiring" the professor in question.

35. The University was also intent on taking action in response to a September 2015 survey of students that found, among other things, that, "[w]hile one in six undergraduate female respondents reported sex-based harassment such as persistent unwanted contact or stalking since coming to UChicago, fewer than one-tenth of these cases were reported to the University."

36. As part of the University's efforts to combat sexual misconduct, the Department of Campus and Student Life operates a program known as "Resources for Sexual Violence Prevention" or "RSVP." According to the school's website, "The mission of Resources for Sexual

Violence Prevention at the University of Chicago is to promote healthy gender relations through dialogue and education and to work toward the elimination of sexual violence."

37.    However, RSVP's facebook page is filled with anti-male vitriol.  Relatively recent posts state:

- Images of men engaged in inappropriate conduct labeled as "rape culture";

- A posting stating: "Weird how all these woman waited to come forward until they realized they weren't alone, it wasn't their fault, and we might believe them."

- An image of document stating, among other things, "Rape culture directs woman to police their clothing, beverages, behavior, and sexuality at all times to avoid men. It portrays men as powerless against their violent sexual urges." The tagline of the posting states: "Liberate the Ladies";

- A posting stating: "Guys, is dressing provocatively in expensive suits whilst having too much to drink causing you to get mugged?";

- An announcement that RSVP, in partnership with UChicago Feminist Forum, was presenting a film with the excepted quote, "society (and my rapist) says I'm too ugly to be raped";

- A posting stating: "The War on Women Is Real";

- A posted video with the comment "Come through, Professor! Melissa Harris-Perry on why we must redefine masculinity";

- A posting stating: "#MasculinitySoFragile that it's more important to teach women to teach women to reject men politely than it is to teach men to accept rejection peacefully";

- An image entitled "When white men rape";

- A link entitled "Violence against women – It's a men's issue"; and

- A link to a video with the title "48 Things Women Hear in a Lifetime* *That men just don't";

38.    Indicative of the mood of campus, the investigation of Plaintiff focused on his gender.

39.    As an example, school investigators questioned Plaintiff about his habit of lightly tapping people to get their attention. Jane Roe, apparently, did not care for this tapping and considered it to be sexual harassment. The investigator specifically challenged Plaintiff, rhetorically asking if he would ever do this to another woman, implying that such conduct was acceptable when done to a man, but not to a woman. Thus, the investigator allowed gender stereotypes to bias his analysis. In fact, Plaintiff has tapped other people, both male and female, and, at no time, did Plaintiff consider such conduct to be sexual in nature, or indicative of romantic interest. However, Plaintiff's gender-neutral use of tapping was absent from the investigator's notes.

40.    It was this investigator's report upon which the University-wide Student Committee ("Committee") would rely when making its determination.

41.    A hearing was held before the Committee on April 10, 2017.

42.    At that hearing, the Committee members demonstrating their own bias based on modern gender stereotypes, by refusing to accept that, in this modern age, someone could have such antiquated views on male-female relationships. They repeatedly questioned Plaintiff about his heart-felt views.

43.    The Committee attempted to undermine Plaintiff by questioning him about the fact that, on another occasion Plaintiff had attended a concert with another female, but Plaintiff did not consider that event to be romantic in nature.

44.    The Committee further questioned Plaintiff on his motive in asking Jane Roe about her virginity, though only asked about her virginity and not his? Plaintiff stated that, based on his cultural upbringing, he expected anyone with whom he was in a serious relationship to be a virgin. The Committee members just could not get past their own notions of gender stereotypes to accept

the possibility that someone might have such beliefs. Indeed, one Committee member asked Plaintiff if, in the course of his relationship with Jane Roe, he had discovered that Jane Roe was not a virgin, would he would continue to date her. Plaintiff stated that he would not. The Committee members were flabbergasted and one exclaimed: "Wow!"

45. The Committee further questioned Plaintiff about his dating history to determine whether Plaintiff's cultural views and his perception of the relationship with Jane Roe was consistent with Plaintiff's past experiences. The Committee, however, never asked such questions to Jane Roe regarding her dating history. The Committee did not care if her past experiences were also consistent with the cultural views on dating expressed by Plaintiff. The Committee refused to believe that someone could possibly hold such views in this modern age.

46. Clearly, the Committee members were allowing their own notions of gender roles to cloud their analysis.

47. In addition to gender bias, this questioning also demonstrates clear cultural biases of the committee members, so much so that they rejected Plaintiff's culture because it was so different from their own.

48. In effect, the Committee discriminated against Plaintiff both on the basis of his gender and on the basis of his ethnicity.

49. The Committee issued a written decision dated May 1, 2017.

50. That decision explicitly acknowledged that "a reasonable person in [Plaintiff's] position may have been confused by the mixed signals coming from [Jane Roe] regarding whether she did or did not want to be contacted by you."

51.     The decision also found that "The implementation of the no-contact directive seems to have mitigated the contact between [Plaintiff] and [Jane Roe] and it is the expectation of the Committee that it will continue to be followed, thus eliminating the ongoing behavior."

52.     Nevertheless, that decision found Plaintiff "responsible" for "sexual harassment" and "stalking," as those terms are defined in the University's "Policy on Discrimination, Harassment, and Sexual Misconduct."

53.     Under the circumstances, the committee placed Plaintiff on disciplinary probation for the remainder of his time as a student.  Plaintiff was also given restricted access to certain school locations where Jane Roe is likely to frequent.  He was also required to participate in an intake appointment with Student Counseling Services.  The committee also issued a No-Contact Directive requiring him to refrain from making any contact whatsoever with Jane Roe.

54.     Moreover, the committee further safeguarded against any potential harassment by Plaintiff against Jane Roe by specifically stating that a violation of the No-Contact Directive would result in Plaintiff's expulsion.

55.     This determination, however, would not stand.

56.     Unfortunately for Plaintiff, that same day, the school newspaper published a lengthy expose entitled "A Special Problem': The University of Chicago's Troubled History With Sexual Assault, Harassment, and Campus Safety" that discussed the school's long history of failing to protect female students.  This further inflamed the existing anti-male bias on campus and the call to crack down on male perpetrators of sexual misconduct.

57.     The University's Student Manual: University Policies and Regulations provides that "The complainant and the accused both may request a review of the outcome within 15 days of being informed, in writing, of the decision."

58.     It goes on to state that "The only legitimate grounds for review are: (1) that prescribed procedures were not followed; (2) that new and material information unavailable to the University-wide Disciplinary Committee would substantially change the outcome of the proceeding; and (3) the sanction is disproportionate to the violation."

59.     Additionally, it provides that, "The Review Board, acting on the basis of the entire record, may sustain, reduce, modify or strike the sanctions imposed if it determines that prescribed procedures were not followed or that the sanction is disproportionate to the violation." Notably, while this provision states that sanctions may be "reduce[d]," it does not say that sanctions may be "increased."  This is consistent with the University's long-standing policy of not increasing sanctions on appeal.  Indeed, the school's website provides summaries of the outcomes of all disciplinary proceedings.  Over the past ten years, there has never been a single instance where a sanction has been increased by the Review Board.

60.     Additionally, the Student Manual provides that, "if the Board is satisfied in its reasoned judgment that the new and material information not available to the University-wide Disciplinary Committee more likely than not would have resulted in a different decision, it may require the University-wide Disciplinary Committee to reconvene and consider the new information in the proceedings."

61.     Jane Roe decided to request a review by the Review Board.  She argued that the sanction was disproportionate to the violation.  However, her appeal did not focus on the acts of Plaintiff, but on her subjective feelings supposedly resulting, after-the-fact, from the decision of the Committee.

62.     Much of her request for review also focuses on gratuitous personal attacks on Plaintiff and the need to punish Plaintiff further because of the supposedly egregious nature of his

actions. However, her representation of the facts ignores the Committee's finding of fact that Plaintiff did not act with malice or ill-intent and that "a reasonable person in [Plaintiff's] position may have been confused by the mixed signals coming from [Jane Roe] regarding whether she did or did not want to be contacted by [Plaintiff]."

63. Although improper, she then purports to introduce new facts, namely that, in the few days since the decision was issued, "I can barely go to classes; even if I do, I cannot concentrate fully." There is no evidence to support these allegations, nor would Plaintiff have an opportunity to refute them. They are also contrary to the finding of fact of the Committee that the "The implementation of the no-contact directive seems to have mitigated the contact between [Plaintiff] and [Jane Roe] and it is the expectation of the Committee that it will continue to be followed, thus eliminating the ongoing behavior."

64. They are also contrary to Jane Roe's own voluntary behavior in choosing to sit close to John Doe in a class held in a very large room during the pendency of the disciplinary proceedings.

65. Moreover, while Jane Roe may have been upset by the decision, there is no evidence to suggest that her initial feelings upon learning the decision would persist for any appreciable amount of time.

66. To be clear, Plaintiff did not, and was never accused of, sexual assault, sexual touching, or committing any kind of physical harm to Jane Roe. Nor is there any reason to believe that Plaintiff poses a threat to her in the future.

67. The findings of fact of the Committee are contrary to any suggestion that Plaintiff poses any kind of future risk to Jane Roe.

68.     Moreover, Plaintiff's punishment was entirely consistent with the prior punishments handed down over the last ten years with respect to students found responsible for violations of the Policy on Discrimination, Harassment, and Sexual Misconduct.

69.     In the 2012-13 academic year, a student found responsible for sexual assault was given a nine-quarter suspension.

70.     That same year, another student who attempted to forcibly penetrate another student with a finger was given probation and asked to take a sexual violence seminar.

71.     That same year, another student accused of sexual assault was given a two-quarter suspension, however, the Review Board determined that proper process was not followed and removed the transcript notation from the accused's record.

72.     Also that year, a student who masturbated near a complainant without the complainant's consent was given probation.

73.     Yet, another student who sexually assaulted another student who was not an acquaintance in a library was given an eight-quarter suspension.

74.     In the 2013-14 academic year, a student responsible for sexual misconduct was given probation.

75.     That year, another student who committed a sexual assault was suspended for nine quarters and a no-contact directive was put in place between both parties.  That student was later expelled *for violating the no-contact directive*.

76.     Another student who committed a sexual assault received probation and a no-contact directive was put in place.

77.     That same year a student who committed a sexual assault was expelled, but only because he had previously been found responsible for other sexual misconduct and was a rep*eat offender*.

78.     Another student found responsible for domestic/dating violence was given probation and was required to seek counselling.

79.     Another student responsible for dating and domestic violence received a formal warning and a no-contact directive.

80.     In the 2014-15 academic year, a student responsible for dating violence received a no-contact directive; course registration restrictions; University program and event restrictions; and counseling.

81.     That same year, another student who committed a sexual assault received a disciplinary warning.

82.     In the 2015-16 academic year, with respect to a student found to have engaged in nonconsensual sexual touching with another student who was deemed incapacitated, the committee imposed several sanctions, including a no-contact directive, priority registration for the complainant, and for the respondent, restricted access to certain parts of the campus, barring from convocation ceremonies, ineligibility to participate in College Study Abroad programs and required participation in educational sessions.  However, there was no probation.

83.     That same year, a student found responsible for engaging in nonconsensual contact with and penetration of a fellow student was given a two-quarter suspension.

84.     Similar punishments were given to students found responsible for violent acts that did not fall within the Policy on Discrimination, Harassment, and Sexual Misconduct

85.     For example, in the 2008-09 academic year, students involved in a physical altercation were given suspensions and the review board reduced the punishment of one student by suspending his suspension.  That same year, another student accused of battery against a fellow student was issued a nine-quarter suspension. Another student accused of battery also received a brief two-quarter suspension.

86.     In the 2009-10 academic year, a student accused of physically assaulting several students and damaging University property received an eight-quarter suspension.

87.     In the 2010-11 academic year, a student who physically assaulted another student was given probation.  That year, another student accused of physical and verbal abuse, and threatening the safety of others in the laboratory received probation and lost laboratory privileges for one quarter.

88.     In the 2011-12 academic year, a student accused of buying, using, and distributing drugs in the residence halls was removed from residential housing and given probation.

89.     In the 2014-15 academic year, a student found responsible for assaulting a Chicago police officer received a disciplinary warning and another student found responsible for physical assault was given a four-quarter suspension.

90.     In the 2015-16 academic year, a student committed physical abuse with respect to the student's involvement in a physical altercation with another student and was placed on probation, banned from campus housing, and directed to obtain counseling. That same year, a student was accused of physical abuse that included the striking of a university security officer in the face and the throwing of the officer to the ground. That student was placed on probation and advised to seek counseling.

91.     Significantly, the only times the University expelled students for violations of the Policy on Discrimination, Harassment, and Sexual Misconduct was where the student was a repeat offender who committed a sexual assault.  Punishments for all other violations of the Policy on Discrimination, Harassment, and Sexual Misconduct were much lower.

92.     Nevertheless, in the face of a growing anti-male sentiment on campus, with respect to Plaintiff's disciplinary proceeding, the Review Board took unprecedented action.  The Review Board determined that under the Student Manual provision allowing them to act if "a sanction is disproportionate to the violation," Plaintiff should be *immediately expelled*.

93.     No such punishment has ever been handed out for a violation such as Plaintiff's.

94.      This is particularly so where the Committee made a finding that "a reasonable person in [Plaintiff's] position may have been confused by the mixed signals coming from [Jane Roe] regarding whether she did or did not want to be contacted by [Plaintiff]."

95.     Also, at no previous time had the Review Board ever *increased* a punishment.

96.     At no previous time had the Review Board expelled a student that was given a lesser punishment by the Committee.

97.     The Review Board stated in writing that its "decision of expulsion rests on ensuring an academic environment for [Jane Roe] *without the threat of continued harassment*." (Emphasis added).

98.     Nothing in the record suggests that there is any continued threat of harassment. Indeed, this determination is contrary to the finding "The implementation of the no-contact directive seems to have mitigated the contact between [Plaintiff] and [Jane Roe] and it is the expectation of the Committee that it will continue to be followed, thus eliminating the ongoing behavior."  Thus, the Review Panel improperly made a new finding of fact.

99. The Review Panel clearly made a determination for a reason other than that the sanction is disproportionate to the violation. Indeed, there is no discussion of Plaintiff's violation in the Review Board's decision, or why that violation was so egregious at to mandate expulsion.

100. In actuality, the decision was not based on the violation at all, but on the theoretical possibility that Plaintiff might commit another violation in the future (the supposed "threat of continued harassment").

101. Nor did the Review Panel remand the matter back to the disciplinary committee for a factual determination of whether there was any true "threat of continued harassment."

102. In actuality, there could not be a real threat because, under the terms of the original Disciplinary Committee decision, Plaintiff would be expelled if he violated the no-contact directive.

103. Plaintiff has never violated the no-contact directive.

104. The Review Panel improperly "put the cart before the horse" by expelling Plaintiff before a future violation occurred. There were already provisions in place to protect Jane Roe if there was actual future harassment, including expulsion.

105. It is wholly inequitable to expel a student because of the possibility that he might commit a violation in the future without any record to suggest a likelihood of such a future violation. Such a determination was beyond the authority of the Review Panel, as set forth in the Student Manual. While the Review Board might be empowered to review punishments for actual violations, they may not impose punishment for possible future violations.

106. The Review Board's conduct was not in accordance of the requirements or procedures set forth in the Student Manual.

107. The Review Board's decision was also arbitrary, capricious, and made in bad faith.

108.    Upon information and belief, this procedurally improper, unprecedented, arbitrary and capricious decision was the result of the strong anti-male atmosphere then permeating the University. This anti-male atmosphere mandated the harsh punishment of male students for sexual misconduct allegedly committed against females.

109.    Indeed, the Review Board's decision came days after the scathing expose in the University newspapers, and on the heels of national media coverage of the University's supposed inability to protect female students from sexual misconduct committed by men.

110.    Moreover, the names of the members of the Review Panel are never revealed. Thus, they can act in complete anonymity, free to violate Plaintiff's rights without backlash.

111.    Such a secretive quasi-judicial panel represents a danger to the basic rights of the students who attend the University.

112.    As a result of the anti-male atmosphere, Plaintiff became a scapegoat.

113.    Also, under the University's Student Manual, Plaintiff had fifteen days from the May 1, 2017 written decision of the Disciplinary Committee to seek a review by the Review Board. The Review Board's decision was issued on May 12, 2017. On May 12, 2017 Plaintiff submitted his own request for review within the fifteen-day period. Despite Plaintiff's timely request for review, the University refused to consider that request.

114.    As a result of the expulsion, Plaintiff's transcript will permanently indicate this punishment.

115.    The expulsion also dramatically reduces the possibility of Plaintiff's once-promising and lucrative career.

116.    Further, the expulsion, itself garners negative stigma, especially when tied to the label of a sex misconduct charge.

117.    It undoubtedly will substantially decrease Plaintiff's future earnings.

118.    Worse yet, because Plaintiff was in the United States on a student visa, he is now potentially subject to immediate deportation.

119.    As a result of the Review Board's decision, upon information and belief, the University notified the Department of Homeland Security's Student and Exchange Visitor Information System ("SEVIS") of Plaintiff's expulsion.  Plaintiff's visa was then revoked.

120.    If this injustice is not remedied, Plaintiff will be forced to leave the country or become subject to deportation.

## FIRST CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

121.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

122.    Plaintiff matriculated to the University with the understanding that his relationship with the University would be governed in accordance with the policies, rules, and regulations of the University.

123.    The University represented that it would act in accordance with its own policies, rules, and regulations.

124.    These policies, rules, and regulations, including the Student Manual: University Policies and Regulations, constitute a binding contract.

125.    Plaintiff has paid substantial amounts in tuition to the University.

126.    The disciplinary proceedings that Plaintiff endured materially deviated from the rules and procedures set forth in the Student Manual.

127.    The decision of the Review Board was arbitrary, capricious, and made in bad faith.

128.     Such a decision was wholly unprecedented.  Publicly available documents do not show a single instance where the Review Board increased a punishment, much less expelled a student.

129.     Publicly available documents do not show a single instance where a student accused of conduct similar to that of which Plaintiff was accused was given such a harsh punishment.

130.     Except in instances where a repeat offender committed a sexual assault, publicly available documents do not show a single instance where a student was expelled for a violation of the Policy on Discrimination, Harassment, and Sexual Misconduct, which is incorporated into the Student Manual.

131.     Publicly available documents show that students found responsible for sexual and physical assaults, who were not repeat offenders, invariably were given much less severe punishments than Plaintiff.

132.     The Review Board disregarded University binding procedures by purporting to find that "the sanction is disproportionate to the violation," but expressly based its decision not on Plaintiff's violation, but the unsupported concern that he might commit another violation in the future.  Such an act is beyond the Review Board's authority.

133.     The Review Board did not remand the matter back to the Committee to make any factual determinations before declaring that there was a "threat of continued harassment."  Such a factual determination was also contrary to the findings of the Committee.  There is also absolutely no evidence of any "threat of continued harassment."

134.     The Review Board also violated the University's policy (whether explicit or implied) that the Review Board would not substantially increase a punishment.

135.    The University also violated its own rules by barring Plaintiff from submitting a timely request for review.

136.    The aforementioned actions constitute breaches of the University's obligations to Plaintiff.

137.    The aforementioned actions also constitute breaches of the University's implied covenant of good faith and fair dealing.

138.    These breaches have caused substantial harm to Plaintiff's future career and earnings in an amount to be determined at trial, but well in excess of $75,000.

139.    The breaches have also prevented Plaintiff from receiving the education for which he bargained.

140.    The breaches also threaten to result in deportation, which would constitute further injury.

141.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus interest, attorneys' fees, expenses, costs and disbursements.

142.    Plaintiff is also entitled to all equitable relief needed to reestablish Plaintiff's position and standing at the University as it was prior to the issuance of the decision of the Review Board.

**SECOND CLAIM FOR RELIEF**
**(VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972)**
**(Selective Enforcement)**

143.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

144.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

145.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

146.    Upon information and belief, the University receives federal funding for research and development.

147.    The University engaged in selective enforcement of its policies as a result of discrimination on the basis of Plaintiff's gender.

148.    At the time of Plaintiff's disciplinary proceeding, the University campus permeated with an anti-male sentiment with respect to alleged acts of sexual misconduct against female students.

149.    This sentiment was widely reported in the press.  Indeed, just days before the Review Board issued its decision, the University's newspaper published a scathing expose of the treatment by the University of female students who alleged that they had been sexually assaulted.

150.    Additionally, three federal investigations are ongoing regarding the University's alleged failure to adequately respond to complaints of sexual assault by female students.

151.    Upon information and belief, the University was under great pressure to crack down on male students accused of sexual misconduct.

152.    Additionally, part of the University's formal efforts to combat sexual violence is its program entitled, "Resources for Sexual Violence Prevention" or "RSVP."  In actually, a substantial part of RSVP's institutional actions appear to revolve around the advancement of anti-male sentiments in the context of alleged sexual misconduct against females.

153.    Moreover, the members of the

154.    Committee demonstrated clear gender biases in the course of the disciplinary proceedings against Plaintiff, including the failure to accept the fact that Plaintiff's view on male-female relationships could vary so much from modern notions of gender roles in the course of a relationship.

155.    Further, the committee questioned Plaintiff on his dating history, but did not do the same with respect to Jane Roe.

156.    Upon information and belief, the Review Board reviewed the biased record created by the Committee.

157.    On the basis of the aforementioned anti-male atmosphere and gender bias, the Review Board determination to increase Plaintiff's sanction from probation to expulsion was arbitrary, capricious, and made in bad faith.

158.    That decision was entirely unprecedented.  Publicly available records do not show a single instance where the type of punishment given to Plaintiff was given to any other student accused of conduct similar to that of Plaintiff.

159.    Publicly available records also do not show a single instance where the Review Board increased a punishment.

160.    These violations of Title IX have caused substantial harm to Plaintiff's future career and earnings in an amount to be determined at trial, but well in excess of $75,000.

161.    The violations have also prevented Plaintiff from receiving the education for which he paid substantial tuition.

162.    The violations also threaten to result in deportation, which would constitute further injury.

163.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus interest, attorneys' fees, expenses, costs and disbursements.

164.     Plaintiff is also entitled to all equitable relief needed to reestablish Plaintiff's position and standing at the University as it was prior to the issuance of the decision of the Review Board.

WHEREFORE, Plaintiff respectfully requests that the Court grant judgment in his favor on all claims for relief and award:

A.     On his First Claim for Relief, a judgment in an amount to be determined at trial, together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements;

B.     On its Second Claim for Relief, a judgment in an amount to be determined at trial, together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements;

C.     All equitable and injunctive relief needed to reestablish Plaintiff's position and standing at the University as it was prior to the issuance of the decision of the Review Board; and

D.     Such other and further relief as the Court deems just and proper.

Dated May 22, 2017                                    Respectfully submitted,


                                                      By:     /s/ James P. Fieweger
                                                      James P. Fieweger
                                                      Illinois Bar No. 6206915
                                                      FALKENBERG FIEWEGER & IVES LLP
                                                      30 N. LaSalle St., Suite 4020
                                                      Chicago, IL 60602
                                                      Tel: (312) 566-4802

Email: jpf@ffilaw.com

-and-

WARSHAW BURSTEIN, LLP
Kimberly C. Lau, Esq. (*pro hac vice*
pending)
555 Fifth Avenue
New York, NY 10017
Tel: (212) 984-7709
Email: klau@wbny.com

*Attorneys for Plaintiff John Doe*