# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

```
-----------------------------------------------------X
JOHN DOE,                              :
                                       :            Civil Action No: 1:17-cv-3781
              Plaintiff,               :
                                       :
      -against-                        :
                                       :
UNIVERSITY OF CHICAGO,                 :
                                       :
              Defendant.               :
-----------------------------------------------------X
```

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

James P. Fieweger
Illinois Bar No. 6206915
**FALKENBERG FIEWEGER & IVES, LLP**
30 N. LaSalle St., Suite 4020
Chicago, IL 60602
Tel: (312) 566-4802
Email: jpf@ffilaw.com

-and-

**WARSHAW BURSTEIN, LLP**

Kimberly C. Lau, Esq. (*pro hac vice* pending)
555 Fifth Avenue
New York, NY 10017
Tel: (212) 984-7709
Email:  klau@wbny.com

*Attorneys for Plaintiff John Doe*

**TABLE OF CONTENTS**

INTRODUCTON ........................................................................1

FACTUAL BACKGROUND ...........................................................1

ARGUMENT .........................................................................12

    I.    THE IRREPARABLE HARM THAT PLAINTIFF FACES IS GREAT
             AND TRADITIONAL LEGAL REMEDIES ARE INADEQUATE .................13

    II.    PLAINTIFF IS LIKELY TO SUCCEED ON HIS CLAIMS FOR RELIEF ...........14

          A.    Breach of Contract .........................................14

          B.    Violation of Title IX ........................................17

    III.    THE EQUITIES FAVOR THE GRANT OF A TEMPORARY
             RESTRAINING ORDER AND A PRELIMINARY INJUNCTION ...............19

    IV.    THE PUBLIC INTEREST FAVORS THE GRANT OF INJUNCTIVE RELIEF ........20

CONCLUSION .......................................................................21

**TABLE OF AUTHORITIES**

**Cases**

*BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) .............................. 12

*Cavel Int'l, Inc. v. Madigan,* 500 F.3d 544 (7th Cir. 2007) ............................. 12

*Coulter v. East Stroudsburg Univ.*, 2010 WL 1816632 (M.D. Pa. May 5, 2010) ............ 14

*Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016) ............................... 19

*Doe v. New York Univ.*, 666 F.2d 761 (2d Cir. 1981), *superseded in part on other grounds*,
*Zervos v. Verizon New York, Inc*., 252 F.3d 163 (2d Cir. 2001) .......................... 14

*Doe v. Univ. of Notre Dame*, No. 3:17CV298-PPS/MGG, 2017 WL 1836939 (N.D. Ind. May 8,
2017) ...............................................................................19

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d 721(7th Cir.
2009) .............................................................................. 13

*Karakozova v. University of Pittsburgh*, 2009 WL 1652469 (W.D. Pa. 2009) ........... 13, 19

*Korte v. Sebelius,* 735 F.3d 654 (7th Cir. 2013) .......................................12

*Liu v. Northwestern University*, 78 F. Supp. 3d 839 (N.D. Ill. 2015) ....................15

*O'Driscoll v. Argosy University*, 2014 WL 714023 (N.D. Ill. 2014) (quoting *Seitz–Partridge v. Loyola Univ. of Chicago*, 409 Ill.App.3d 76 (1st Dist. 2011)) . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health,* 699 F.3d 962 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Raethz v. Aurora Univ.*, 346 Ill.App.3d 728 (2d Dist. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## **Statutes**

20 U.S.C. § 1681(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## **Other Sources**

The Chicago Maroon, "'*A Special Problem*': *The University of Chicago's Troubled History With Sexual Assault, Harassment, and Campus Safety*" (May 1, 2017), available at https://www.chicagomaroon.com/article/2017/5/1/special-problem-university-chicagos-troubled-histo/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*See* The Chronicle of Higher Education, University of Chicago Title IX Cases, https://projects.chronicle.com/titleix/campus/University-of-Chicago/ (last visited May 19, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

https://www.facebook.com/UChicagoRSVP/?hc_ref=PAGES_TIMELINE . . . . . . . . . . . . . . . .18

## INTRODUCTION

Plaintiff John Doe ("John Doe" or "Plaintiff") respectfully submits this memorandum of law in support of his motion for a temporary restraining order and preliminary injunction. Plaintiff was unlawfully expelled from the University of Chicago (the "University") in violation of his contractual rights, as well as his statutory rights under Title IX. Plaintiff is also a citizen of a foreign country who was in the United States on a student visa. As a result of his expulsion, he is now subject to deportation. To prevent this irreparable harm from occurring, Plaintiff seeks a temporary restraining order and preliminary injunction to maintain the *status quo ante* and require the University to:

A. Reinstate Plaintiff as a student at the University;

B. Allow Plaintiff to resume his studies subject to the terms of a decision issued by the University-wide Student Disciplinary Committee dated May 1, 2017; and

C. Take all necessary steps to notify, update, and reactivate the Student and Exchange Visitor Information System ("SEVIS") regarding Plaintiff's reinstatement in order for plaintiff to be reinstated back to student (F-1) status, and take all necessary steps to prevent Plaintiff from being subject to deportation proceedings by the United States Citizenship and Immigration Services ("USCIS") resulting from any prolonged violation of F-1 student status or prolonged period without valid F-1 student status as a result of the University's actions in terminating his SEVIS activation.

## FACTUAL BACKGROUND

John Doe was wrongfully expelled from the University. His reputation has been tarnished and a once promising career has been put in jeopardy. More imminently, as a result of this expulsion, John Doe is now subject to deportment. Beginning in January 2017, the University initiated a disciplinary proceeding against him as a result of a complaint by a fellow student ("Jane Roe"). Although, the University-wide Student Disciplinary Committee (the "Committee") found substantial mitigating circumstances, pursuant to a decision dated May 1, 2017, Plaintiff was found responsible for violating the University's Policy on Discrimination, Harassment, and Sexual

1

Misconduct.  *See* **Exhibit 1** of Declaration of John Doe ("Doe Decl.").  However, to be clear, he never committed, or was accused of, any sexual assault, sexual touching, or committing any physical harm.

Under the circumstances, pursuant to the May 1, 2017 decision, John Doe was placed on disciplinary probation and restricted access to certain school locations where Jane Roe was likely to frequent.  *Id*.  In January 2010, the disciplinary committee also issued a No-Contact Directive requiring him to refrain from making contact with the accuser.  The May 1, 2017 decision extended that No-Contact Directive to remain in place for the remainder of John Doe's time as a student of the University.  *Id*.  Any violation of that No-Contact Directive would result in Plaintiff's expulsion.  *Id*.  Plaintiff has never violated that No-Contact Directive.  Doe Decl. ¶ 16.

Despite the determination of the Committee, the May 1, 2017 decision was reviewed by the University Review Board.  In an entirely unprecedented decision, dated May 12, 2017, the Review Board expelled Plaintiff for his actions.  *See* Doe Decl. **Exhibit 2**.  Not only was it unprecedented, it violated the University's own policies and rules, including the Student Manual: University Policies and Regulations ("Student Manual") (annexed as Doe Decl. **Exhibit 3**). Summaries of disciplinary proceedings at the University available on the University's website (collectively annexed as Doe Decl. **Exhibit 4**) do not show a single instance where the Review Board increased a punishment, much less independently expelled a student.  They also do not show a single instance where a student accused of similar conduct was expelled. *See* Doe Decl. **Exhibit 4**.

Moreover, the Review Board, which acted entirely outside its authority under the Student Manual, increased Plaintiff's punishment because of a supposed "threat of continuing harassment" by Plaintiff against Jane Roe.  *See* Doe Decl. **Exhibit 2** at 2.  In actuality, there was absolutely no

2

evidence of any threat of continuing harassment and such a determination was contrary to the findings in the May 1, 2017 decision, as well as the safeguards put in place by the May 1, 2017 decision to limit future contact between Plaintiff and his accuser. That unprecedented decision of the Review Board was entirely arbitrary, capricious, and made in bad faith, in violation of Plaintiff's contractual and statutory rights.

Worse yet, absent relief from this Court, Plaintiff will be forced to leave the United States or be subject to deportation.

Plaintiff was a Ph.D. student at the University of Chicago and worked extremely hard to achieve one of the highest rankings in his program. Doe Decl. ¶ 5. He is a citizen of a foreign country[1] that has different cultural values and cultural norms than the United States. *Id* ¶ 6. Specifically, in the conservative culture in which Plaintiff was raised, romantic courtships are commonly non-sexual and merely consist of a male and female spending time together. Acts by a female such as inviting a male to spend time together privately or to engage in various everyday activities are considered signs of romantic interest. *Id* ¶¶ 9-10.

Jane Roe was also a Ph.D. student at the University of Chicago. She is also from the same country as Plaintiff. *Id* ¶ 7. Plaintiff became romantically interested in Jane Roe. Jane Roe's actions, seen through the lens of their shared culture, indicated that she was also romantically interested in Plaintiff. *Id* ¶ 9. The two regularly spent time together. She also invited him to join her in activities such as swimming and jogging. She also verbally expressed to Plaintiff that she might be interested in romantic relationship with him. *Id* ¶ 9. Based on these interactions, as well as the fact that the two spent large amounts of time with one another, Plaintiff believed he was in

---

[1]        The name of the country is not disclosed in order to protect the anonymity and privacy interests of Plaintiff and certain non-parties.

a romantic relationship with Jane Roe, despite the fact that the two never kissed, much less engaged in sexual activity of any kind. *Id* ¶ 10. For this reason, Plaintiff regularly contacted Jane Roe and expressed his feelings for her. *Id* ¶ 10.

Jane Roe viewed their relationship differently. At some point, she ceased to have any romantic interest in Plaintiff. However, to Plaintiff, her actions continued to suggest that she did have a romantic interest. *Id* ¶¶ 13-14. This misunderstanding resulting from Plaintiff's cultural upbringing, as well as from "mixed signals" given by Jane Roe, led to tension between the two. *Id* ¶ 14.

Based on her perception of their interactions, in January 2017, Jane Roe filed a complaint with the University against Plaintiff. *Id* ¶ 15. The school initiated an investigation as part of a disciplinary proceeding against Plaintiff and immediately issued a "No-Contact Directive" limiting Plaintiff's contact with Jane Roe. *Id* ¶ 17. A hearing was held before the Committee on April 10, 2017. *Id* ¶ 22.

Subsequently, the Committee issued a written decision on May 1, 2017. Doe Decl. **Exhibit 1**. That decision explicitly acknowledged that "a reasonable person in [Plaintiff's] position may have been confused by the mixed signals coming from [Jane Roe] regarding whether she did or did not want to be contacted by you." *Id*. The decision also found that "The implementation of the no-contact directive seems to have mitigated the contact between [Plaintiff] and [Jane Roe] and it is the expectation of the Committee that it will continue to be followed, thus eliminating the ongoing behavior." *Id*. Nevertheless, that decision found Plaintiff "responsible" for "sexual harassment" and "stalking," as those terms are defined in the University's "Policy on Discrimination, Harassment, and Sexual Misconduct." *Id*.

Under the circumstances, the committee placed Plaintiff on disciplinary probation for the remainder of his time as a student. *Id.* Plaintiff was also given restricted access to certain school locations where Jane Roe is likely to frequent. *Id.* He was also required to participate in an intake appointment with Student Counseling Services. *Id.* The committee also issued a No-Contact Directive requiring him to refrain from making any contact whatsoever with Jane Roe. *Id.* Moreover, the committee further safeguarded against any potential harassment by Plaintiff against Jane Roe by specifically stating that a violation of the No-Contact Directive would result in Plaintiff's expulsion. *Id.*

At the request of Jane Roe, the May 1, 2017 decision was reviewed by the Review Board. This could not have come at a worse time for Plaintiff. At that time, the University was in the grips of a public relations crisis regarding the school's failure to specifically protect female students from sexual assaults committed by males. There was a strong sentiment on campus and in the media for the school to aggressively go after males accused of sexual misconduct. On March 1, 2016, the Chicago Tribune published an article entitled, "Federal authorities investigating sexual violence complaints at several area colleges." (available at http://www.chicagotribune.com/news/local/breaking/ct-universities-sexual-violence-investigations-20160301-story.html). That article discussed three federal investigations relating to the University's failure to adequately respond to female students who reported being sexual assaulted by males. In response to then newly-implemented procedures at the school relating to complaints of sexual assault, one female rape victim is quoted as saying that, "she doesn't believe the school has done enough." *Id.*

On February 2, 2016, an article in the New York Times entitled, "Chicago Professor Resigns Amid Sexual Misconduct Investigation" (available at

5

https://www.nytimes.com/2016/02/03/us/chicago-professor-resigns-amid-sexual-misconduct-investigation.html?_r=0), specifically discussed problems faced by female science graduate students at the University, noting that the "resignation comes amid calls for universities to be more transparent about sexual harassment in their science departments, where women account for only one-quarter of senior faculty jobs." *Id*. The article further noted that "some students and faculty members also raised pointed questions about whether the university had placed female graduate students at risk by hiring" the professor in question. *Id*.

As part of the University's efforts to combat sexual misconduct, the Department of Campus and Student Life operates a program known as "Resources for Sexual Violence Prevention" or "RSVP." However, that University program's facebook page is filled with anti-male vitriol. *See* https://www.facebook.com/UChicagoRSVP/?hc_ref=PAGES_TIMELINE. Relatively recent posts include, *inter alia*:

- Images of men engaged in inappropriate conduct labeled as "rape culture";

- A posting stating: "Weird how all these woman waited to come forward until they realized they weren't alone, it wasn't their fault, and we might believe them."

- An image of document stating, among other things, "Rape culture directs woman to police their clothing, beverages, behavior, and sexuality at all times to avoid men. It portrays men as powerless against their violent sexual urges." The tagline of the posting states: "Liberate the Ladies";

- A posting stating: "Guys, is dressing provocatively in expensive suits whilst having too much to drink causing you to get mugged?";

- An announcement that RSVP, in partnership with UChicago Feminist Forum, was presenting a film with the excepted quote, "society (and my rapist) says I'm too ugly to be raped";

- A posting stating: "The War on Women Is Real";

- A posted video with the comment "Come through, Professor! Melissa Harris-Perry on why we must redefine masculinity";

- A posting stating: "#MasculinitySoFragile that it's more important to teach women to teach women to reject men politely than it is to teach men to accept rejection peacefully";

- An image entitled "When white men rape";

- A link entitled "Violence against women – It's a men's issue"; and

- A link to a video with the title "48 Things Women Hear in a Lifetime* *That men just don't";

On the day the Committee's decision was issued, May 1, 2017, the University newspaper published a lengthy expose entitled "'A Special Problem': The University of Chicago's Troubled History With Sexual Assault, Harassment, and Campus Safety" (available at https://www.chicagomaroon.com/article/2017/5/1/special-problem-university-chicagos-troubled-histo/) that discussed the school's long history of failing to protect female students. This further inflamed the existing anti-male bias on campus and the call to crack down on male perpetrators of sexual misconduct.

With respect to the review by the Review Board, the Student Manual provides that "The only legitimate grounds for review are: (1) that prescribed procedures were not followed; (2) that new and material information unavailable to the University-wide Disciplinary Committee would substantially change the outcome of the proceeding; and (3) the sanction is disproportionate to the violation." Doe Decl. **Exhibit 3** at 113. Additionally, it provides that, "The Review Board, acting on the basis of the entire record, may sustain, reduce, modify or strike the sanctions imposed if it determines that prescribed procedures were not followed or that the sanction is disproportionate to the violation." *Id.* Notably, while this provision states that sanctions may be "reduce[d]," it does not say that sanctions may be "increased." This is consistent with the University's long-standing policy that the Review Board not increase punishments. Indeed, the school's website provides summaries of the outcomes of all disciplinary proceedings. *See* Doe Decl. **Exhibit 4**. Over the

7

past ten years, there has never been a single instance where a sanction has been increased by the Review Board. *Id.*

Moreover, Plaintiff's punishment under the May 1, 2017 decision was entirely consistent with the prior punishments handed down over the last ten years with respect to students found responsible for violations of the Policy on Discrimination, Harassment, and Sexual Misconduct. *Id.* As examples, in the 2012-13 academic year, a student found responsible for sexual assault was given a nine-quarter suspension. *Id.* That same year, another student who attempted to forcibly penetrate another student with a finger was given probation and asked to take a sexual violence seminar. *Id.* That same year, another student accused of sexual assault was given a two-quarter suspension, however, the Review Board determined that proper process was not followed and removed the transcript notation from the accused's record. *Id.* Also that year, a student who masturbated near a complainant without the complainant's consent was given probation. *Id.* Yet, another student who sexually assaulted another student who was not an acquaintance in a library was given an eight-quarter suspension. *Id.* In the 2013-14 academic year, a student responsible for sexual misconduct was given probation. *Id.* That year, another student who committed a sexual assault was suspended for nine quarters and a no-contact directive was put in place between both parties. *Id.* That student was later expelled *for violating the no-contact directive*. *Id.* Another student who committed a sexual assault received probation and a no-contact directive was put in place. *Id.* That same year a student who committed a sexual assault was expelled, but only because he had previously been found responsible for other sexual misconduct and was a rep*eat offender*. *Id.* Another student found responsible for domestic/dating violence was given probation and was required to seek counselling. *Id.* Another student responsible for dating and domestic violence received a formal warning and a no-contact directive. *Id.*

In the 2014-15 academic year, a student responsible for dating violence received a no-contact directive; course registration restrictions; University program and event restrictions; and counseling. *Id*. That same year, another student who committed a sexual assault received a disciplinary warning. *Id*. In the 2015-16 academic year, with respect to a student found to have engaged in nonconsensual sexual touching with another student who was deemed incapacitated, the committee imposed several sanctions, including a no-contact directive, priority registration for the complainant, and for the respondent, restricted access to certain parts of the campus, barring from convocation ceremonies, ineligibility to participate in College Study Abroad programs and required participation in educational sessions. *Id*. However, there was no probation. *Id*. That same year, a student found responsible for engaging in nonconsensual contact with and penetration of a fellow student was given a two-quarter suspension. *Id*.

Similar punishments were given to students found responsible for violent acts that did not fall within the Policy on Discrimination, Harassment, and Sexual Misconduct. For example, in the 2008-09 academic year, students involved in a physical altercation were given suspensions and the review board reduced the punishment of one student by suspending his suspension. *Id*. That same year, another student accused of battery against a fellow student was issued a nine-quarter suspension. Another student accused of battery also received a brief two-quarter suspension. *Id*. In the 2009-10 academic year, a student accused of physically assaulting several students and damaging University property received an eight-quarter suspension. *Id*. In the 2010-11 academic year, a student who physically assaulted another student was given probation. *Id*. That year, another student accused of physical and verbal abuse, and threatening the safety of others in the laboratory received probation and lost laboratory privileges for one quarter. *Id*. In the 2011-12 academic year, a student accused of buying, using, and distributing drugs in the residence halls

9

was removed from residential housing and given probation. *Id*. In the 2014-15 academic year, a student found responsible for assaulting a Chicago police officer received a disciplinary warning and another student found responsible for physical assault was given a four-quarter suspension. *Id*. In the 2015-16 academic year, a student committed physical abuse with respect to the student's involvement in a physical altercation with another student and was placed on probation, banned from campus housing, and directed to obtain counseling. *Id*. That same year, a student was accused of physical abuse that included the striking of a university security officer in the face and the throwing of the officer to the ground. That student was placed on probation and advised to seek counseling. *Id*.

Significantly, the only times the University expelled students for violations of the Policy on Discrimination, Harassment, and Sexual Misconduct was where the student was a repeat offender who committed a sexual assault. Punishments for all other violations of the Policy on Discrimination, Harassment, and Sexual Misconduct were much lower. *Id*.

Nevertheless, in the face of a growing anti-male sentiment on campus, with respect to Plaintiff's disciplinary proceeding, the Review Board took unprecedented action. The Review Board determined that under the Student Manual provision allowing them to act if "a sanction is disproportionate to the violation," Plaintiff should be *immediately expelled*. *See* Doe Decl. **Exhibit 2** at 1. No such punishment has ever been handed out for a violation such as Plaintiff's. This is particularly unprecedented where the May 1, 2017 decision made a finding that "a reasonable person in [Plaintiff's] position may have been confused by the mixed signals coming from [Jane Roe] regarding whether she did or did not want to be contacted by [Plaintiff]." Doe Decl. **Exhibit 1** at 1.

10

Also, at no previous time had the Review Board ever *increased* a punishment. *See* Doe Decl. **Exhibit 4**. The Review Board stated in writing that its "decision of expulsion rests on ensuring an academic environment for [Jane Roe] *without the threat of continued harassment*." (Emphasis added). Doe Decl. **Exhibit 2** at 2. Nothing in the record suggested that there is any continued threat of harassment. Indeed, this determination is contrary to the finding "The implementation of the no-contact directive seems to have mitigated the contact between [Plaintiff] and [Jane Roe] and it is the expectation of the Committee that it will continue to be followed, thus eliminating the ongoing behavior." *See* Doe Decl. **Exhibit 1**. Thus, the Review Panel improperly made a new finding of fact.

The Review Panel clearly made a determination for a reason other than that the sanction is disproportionate to the violation. Indeed, there is no discussion of Plaintiff's violation in the Review Board's decision, or why that violation was so egregious as to mandate expulsion. *See* Doe Decl. **Exhibit 2**. In actuality, the decision was not based on the violation at all, but on the theoretical possibility that Plaintiff might commit another violation in the future (the supposed "threat of continued harassment"). There could not be a real threat because, under the terms of the original May 1, 2017 decision, Plaintiff would be expelled if he violated the No-Contact Directive (Plaintiff has never violated the directive). *See* Doe Decl. ¶ 16 and **Exhibit 1**.

Such a determination was beyond the authority of the Review Panel, as set forth in the Student Manual. *See* Doe Decl. **Exhibit 3** at 113. While the Review Board might be empowered to review punishments for actual violations, they may not impose punishment for possible future violations. The Review Board's decision was simply arbitrary, capricious, and made in bad faith. Upon information and belief, the decision resulted from the strong anti-male atmosphere then permeating the University. Cmplt. ¶¶ 32-37.

11

Also, under the Student Manual, Plaintiff had fifteen days from the May 1, 2017 written decision of the Committee to seek a review by the Review Board. The Review Board's decision was issued on May 12, 2017. On May 12, 2017 Plaintiff submitted his own request for review within the fifteen-day period. Doe Decl. ¶ 40. Despite Plaintiff's timely request for review, the University refused to consider that request. *Id*.

As a result of the Review Board's decision, upon information and belief, the University notified the Department of Homeland Security's Student and Exchange Visitor Information System ("SEVIS") of Plaintiff's expulsion. Doe Decl. ¶ 3. Plaintiff's student visa was then revoked. *Id*. He is now subject to deportation.

## **ARGUMENT**

To obtain a temporary restraining order or preliminary injunction, "the moving party must make an initial showing that (1) it will suffer irreparable harm in the period before final resolution of its claims; (2) traditional legal remedies are inadequate; and (3) the claim has some likelihood of success on the merits. If the moving party makes this showing, the court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 323-24 (7th Cir. 2015) (citations omitted). This equitable balancing process involves a "sliding scale" analysis, "weighing harm to a party by the merit of [the] case," *Cavel Int'l, Inc. v. Madigan,* 500 F.3d 544, 547 (7th Cir. 2007), with the aim "to minimize the costs of a wrong decision," *Korte v. Sebelius,* 735 F.3d 654, 665 (7th Cir. 2013). "The strength of the moving party's likelihood of success on the merits affects the balance of harms." *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health,* 699 F.3d 962, 972 (7th Cir. 2012). Similarly, "the more net harm an injunction can prevent, the weaker the

plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d 721, 725 (7th Cir. 2009).

## I.  THE IRREPARABLE HARM THAT PLAINTIFF FACES IS GREAT AND TRADITIONAL LEGAL REMEDIES ARE INADEQUATE

As a result of the unlawful actions of the University, Plaintiff must abandon his studies and leave the country or face deportation. Such imminent risk of deportation constitutes a "strong showing of immediate and irreparable harm." *Karakozova v. University of Pittsburgh*, 2009 WL 1652469, at *3–4 (W.D. Pa. 2009). Similar to Plaintiff, in *Karakozova*, the plaintiff alleged that she was terminated from her employment as a result of illegal discrimination and that such termination triggered the revocation of her work visa. *Id* at *1-2. The court granted Karakozova a preliminary maintaining the *status quo ante* and requiring defendant to maintain her employment while Karakozova pursued administrative remedies relating to her claims of discrimination. *Id* at *5.

There is also the additional irreparable harm that results from Plaintiff's inability to continue his studies absent injunctive relief. If Plaintiff does not return to classes immediately, he will lose the benefit of his second year of the Ph.D. program, which will set him back by at least one year in his Ph.D. program. Also, the failure to receive grades in these courses will significantly delay and negatively impact his Ph.D. candidacy. Up until now, Plaintiff's academic transcript has been unblemished and Plaintiff has attained all "A's" and "A+'s" in his coursework to achieve the highest ranking in his program in his second year. This is one of the most prestigious programs in the world where his professors are Nobel Laureates.

Foreclosing Plaintiff from completing his second year of the Ph.D. program will, at worst, result in his ejectment from the Ph.D. program for academic reasons. At best, this places a blemish on his extraordinary academic career, which will cause a domino effect of harm to his professional

career in that his reputation and ranking in this program will be irreparably harmed in the eyes of future employers. He will miss the remainder of the academic year and, even if ultimately successful in this litigation, he will be forced to re-take his entire second year of the Ph.D. program's current classes, and there will be a significant impact to the progress of his curriculum paper which is necessary to his Ph.D. candidacy. Therefore, Plaintiff's academic progress will be irreparably harmed and further delayed as this litigation proceeds. Irreparable harm may be demonstrated by an interruption in graduate studies that have already begun, as opposed to a mere delay in pursuing graduate studies in the future. *See Coulter v. East Stroudsburg Univ.*, 2010 WL 1816632, at *3 (M.D. Pa. May 5, 2010) (student who was facing suspension from school during the middle of the academic year met his burden of showing irreparable harm); *Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir. 1981), *superseded in part on other grounds*, *Zervos v. Verizon New York, Inc.*, 252 F.3d 163 (2d Cir. 2001).

Moreover, there is no traditional adequate legal remedy available to Plaintiff. Money damages cannot undo the harm of deportation. Nor can they remedy the interruption in Plaintiff's studies. Money damages cannot return Plaintiff to his PhD studies at one of the most prestigious schools in the United States.

## II. PLAINTIFF IS LIKELY TO SUCCEED ON HIS CLAIMS FOR RELIEF

Plaintiff asserts two claims for relief, breach of contract, and the violation of his rights under Title IX. He is likely to succeed on both.

### A. Breach of Contract

"[A] college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins." *Raethz v. Aurora Univ.*, 346 Ill.App.3d 728, 732 (2d Dist. 2004). "[I]n the student-university context, a student may have

a remedy for breach of contract when it is alleged that an adverse academic decision has been made concerning the student but only if that decision was made arbitrarily, capriciously, or in bad faith." *Raethz*, 346 Ill.App.3d at 732.  "In other words, a 'student has a valid cause of action against a school when it is alleged that an adverse decision against a student "supposedly for academic deficiencies, was made arbitrarily, capriciously, and in bad faith."'" *O'Driscoll v. Argosy University*, 2014 WL 714023, at *2 (N.D. Ill. 2014) (quoting *Seitz–Partridge v. Loyola Univ. of Chicago*, 409 Ill.App.3d 76, 82–83 (1st Dist. 2011)); *see also Liu v. Northwestern University*, 78 F. Supp. 3d 839, 848 (N.D. Ill. 2015) (permitted claim against private university arising out of disciplinary action inconsistent with school rules and policies).

The Review Board's decision to expel Plaintiff because of the possibility of a future violation, on its face, was arbitrary, capricious, and made in bad faith.  Indeed, the Review Board clearly exceeded its authority. The Student Manual limits the Review Board's ability to act to instances that meet one of three "legitimate grounds for review:" "(1) that prescribed procedures were not followed; (2) that new and material information unavailable to the University-wide Committee would substantially change the outcome of the proceeding; and (3) the sanction is disproportionate to the violation."  Doe Decl. **Exhibit 3** at 113.  The Review Board purported to increase Plaintiff's punishment because "the sanction is disproportionate to the violation."  Doe Decl. **Exhibit 2** at 1.  However, the purported basis for the decision had nothing to do with Plaintiff's violation.  Rather, it was based on the unsupported concern of a potential future violation.  The decision explicitly says that: "The Review Board's decision of expulsion rests on ensuring an academic environment complainant without the threat of continued harassment."  *Id* at 2.  Under the Student Manual, the Review Board has no right to change a punishment on such grounds.

15

Moreover, there was no "threat of continued harassment." There is no evidence that suggest any "threat of continued harassment." Nor did the Review Board refer to anything in the record to support its determination. Such a determination is also contrary to the finding of fact of the Committee that the "The implementation of the no-contact directive seems to have mitigated the contact between [Plaintiff] and [Jane Roe] and it is the expectation of the Committee that it will continue to be followed, thus eliminating the ongoing behavior." *See* Doe Decl. **Exhibit 1**.

In actuality, Plaintiff never violated the no-contact directive. Doe Decl. ¶ 16. There also could not be a real threat because, under the terms of the May 1, 2017 decision, Plaintiff would be expelled if he violated the no-contact directive. *See* Doe Decl. **Exhibit 1**. Moreover, the notion that there some tangible threat is undermined by the fact that, even after the no-contact directive was first put in place, in classes held in large auditoriums, Jane Roe repeatedly chose to sit immediately behind Plaintiff as opposed to any of the more than 50 open seats available in the auditorium. Doe Decl. ¶ 43.

The Review Board also breached the implicit University policy that it not increase punishment imposed by the Committee. The Student Manual provides that, "The Review Board, acting on the basis of the entire record, may sustain, reduce, modify or strike the sanctions imposed if it determines that prescribed procedures were not followed or that the sanction is disproportionate to the violation." Doe Decl. **Exhibit 3** at 113. Notably, while this provision states that sanctions may be "reduce[d]," it does not say that sanctions may be "increased." *Id*. This is consistent with the University's long-standing policy that the Review Board not increase sanctions. Indeed, the school's website provides summaries of the outcomes of all disciplinary proceedings. *See* Doe Decl. **Exhibit 4**. Over the past ten years, there has never been a single instance where a sanction has been increased by the Review Board. *Id*.

The arbitrary and capricious nature of the Review Board's decision is also demonstrated by its unprecedented nature. In the documents annexed as Doe Decl. **Exhibit 4**, there is not a single reported instance where the Review Board increased a punishment, much less independently expelled a student. There is not a single reported instance where a student accused of similar conduct was given such a harsh punishment. *Id.* Except in instances where a repeat offender committed a sexual assault, there is not a single reported instance where a student was expelled for a violation of the Policy on Discrimination, Harassment, and Sexual Misconduct, which is incorporated into the Student Manual. *Id.* These same documents also show that, except in the cases of repeat offenders, there is not a single reported instance where a student who committed a sexual or physical assault was given a punishment as harsh. *Id.*

The foregoing is strong evidence that the University acted in an arbitrary and capricious manner and breached its obligations to Plaintiff.

### B.     Violation of Title IX

Plaintiff is likely to succeed under his claim of "selective enforcement" in violation of Title IX. Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). Under a "selective enforcement" theory, the plaintiff must show that, regardless of guilt or innocence, "the severity of the penalty and/or the decision to initiate the proceeding was affected by the [plaintiff's] gender." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

For all the reasons discussed above with respect to Plaintiff's breach of contract claim, the penalty received by Plaintiff was unduly severe. As for whether that punishment was affected by

17

Plaintiff's gender, it was no coincidence that, at the same time the Review Board acted, there was a loud movement, voiced both on campus and in the media, for the University to take stronger actions regarding sexual misconduct committed against female students by male students. Indeed, only days before the Review Board decision, the University student newspaper ran a scathing article on the University's failure to take effective action in the face of complaints of sexual assault by female students. *See* The Chicago Maroon, "'*A Special Problem': The University of Chicago's Troubled History With Sexual Assault, Harassment, and Campus Safety*" (May 1, 2017), available at https://www.chicagomaroon.com/article/2017/5/1/special-problem-university-chicagos-troubled-histo/.

Moreover, at that time, there were also three federal investigations pending regarding the University's alleged failure to adequately respond to complaints of sexual assault by female students. *See* The Chronicle of Higher Education, University of Chicago Title IX Cases, https://projects.chronicle.com/titleix/campus/University-of-Chicago/ (last visited May 19, 2017). Further, part of the University's formal efforts to combat sexual violence is its program entitled, "Resources for Sexual Violence Prevention" or "RSVP." In actually, a substantial part of RSVP's institutional actions appear to revolve around the advancement of anti-male sentiments in the context of alleged sexual misconduct against females. *See* https://www.facebook.com/UChicagoRSVP/?hc_ref=PAGES_TIMELINE. There was a clear anti-male bias on campus with respect to complaints of sexual misconduct committed against female students.

It is believed that the University felt strong pressure at that time to take stronger and more aggressive measures against male students accused of sexual misconduct against female students. It is further believed that this was a primary reason for the Review Board's unprecedented decision.

If so, it would constitute a violation of Title IX. *See Doe v. Columbia University*, 831 F.3d 46, 58 (2d Cir. 2016).

### III. THE EQUITIES FAVOR THE GRANT OF A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

In a recent Seventh Circuit case, *Doe v. Univ. of Notre Dame*, No. 3:17CV298-PPS/MGG, 2017 WL 1836939, at *13 (N.D. Ind. May 8, 2017), the district court granted the student's temporary restraining order to sit for his remaining exams, determining that the balance of hardships would fall disproportionately on Plaintiff; "to administer two exams to John Doe is a modest requirement, [and] it presents no logistical burden to Notre Dame and is virtually costless to the institution."

As in *Karakozova*, where the plaintiff was about to be deported, "after balancing the harm to the parties, there will be a greater harm to plaintiff if the injunction is not granted, and the potential harm to defendant is more minimal." *Karakozova v. University of Pittsburgh*, 2009 WL 1652469, at *4 (W.D. Pa. 2009). The harm to Plaintiff is imminent and great. There is little, if any, harm that the University will face if the requested relief is granted. The University will merely have to take a few administrative efforts to reinstate Plaintiff (who would remain subject to the effects of the May 1, 2017 decision and the incorporated no-contact directive) and to notify SEVIS of Plaintiff's status change, which would allow Plaintiff to remain in the country on a student visa.

Like the plaintiff in *Doe v. Univ. of Notre Dame*, the balance of the hardships would fall disproportionally on Plaintiff in ejecting him from the Ph.D. program, depriving him of an education award valued at $450,000, irreparably tarnishing his reputation and future employability, and subjecting him to deportation from the United States, whereas it would cost nothing for the University to allow Plaintiff to complete the last two weeks of his second year of the Ph.D. program.

To the extent the University asserts that there may be harm to Jane Roe, there is no evidence of this. Plaintiff would remain subject to the no-contact directive. Moreover, to the extent they may attend the same classes, that will cease at the end of the present semester. Beginning this summer, Plaintiff and Jane Roe will be assigned work spaces in different buildings and they are unlikely to have future classes together. Doe Decl. ¶ 45.

Even if they have a future class together, there is no evidence that Plaintiff will harass Jane Roe in the future. Plaintiff has never violated the no-contact directive. Doe Decl. ¶ 16. Indeed, pursuant to the May 1, 2017 decision, any violation of the no-contact directive would result in Plaintiff's expulsion. Doe Decl. **Exhibit 1**. This effectively eliminates the possibility of future harassment. Moreover, Jane Roe's actions while the no-contact directive has been in place indicate that she is not truly concerned with potential harassment by Plaintiff. Indeed, in classes held in large rooms, she commonly chooses to sit near Plaintiff. Doe Decl. ¶ 43.

But for the clearly unprecedented, arbitrary, and capricious Review Board decision, there would be no need to obtain injunctive relief. It is the inequitable actions of the University that bring the parties before the Court. Thus, the equities weigh in favor of the granting of the sought relief.

## IV. THE PUBLIC INTEREST FAVORS the GRANT OF INJUNCTIVE RELIEF

The public interest weighs in favor of granting an injunctive because it would maintain the *status quo ante* and allow Plaintiff to continue his studies. Moreover, the need for injunctive relief is premised on actions of the University that clearly violate the University's own policies and rules and the contractual and statutory rights of Plaintiff. Under the circumstances, the public interest is to protect Plaintiff from the exacerbation of harm through deportation.

## CONCLUSION

John Doe respectfully requests that the Court grant this motion in its entirety and issue a temporary restraining order and preliminary injunction to maintain the *status quo ante* and require the University to:

A. Reinstate Plaintiff as a student at the University;

B. Allow Plaintiff to resume his studies subject to the terms of a decision issued by the University-wide Student Disciplinary Committee dated May 1, 2017; and

C. Take all necessary steps to notify, update, and reactivate the Student and Exchange Visitor Information System ("SEVIS") regarding Plaintiff's reinstatement in order for plaintiff to be reinstated back to student (F-1) status, and take all necessary steps to prevent Plaintiff from being subject to deportation proceedings by the United States Citizenship and Immigration Services ("USCIS") resulting from any prolonged violation of F-1 student status or prolonged period without valid F-1 student status as a result of the University's actions in terminating his SEVIS activation.

John Doe further requests that, pursuant to Fed. R. Civ. P. 65(c), the Court require a bond in the amount of $50, together with such other and further relief as the Court deems just and proper.

Dated May 22, 2017

Respectfully submitted,

By:  ⟋s⟋ James P. Fieweger
James P. Fieweger
Illinois Bar No. 6206915
**FALKENBERG FIEWEGER & IVES LLP**
30 N. LaSalle St., Suite 4020
Chicago, IL 60602
Tel: (312) 566-4802
Email: jpf@ffilaw.com
-and-

**WARSHAW BURSTEIN, LLP**
Kimberly C. Lau, Esq. (*pro hac vice* pending)
555 Fifth Avenue
New York, NY 10017
Tel: (212) 984-7709
Email: klau@wbny.com

*Attorneys for Plaintiff John Doe*